UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| YIPPY, INC. and RICHARD GRANVILLE, :<br>:<br>Plaintiffs, :<br>:<br>- against - :<br>:<br>HANOVER HOLDINGS I LLC and MAGNA :<br>GROUP LLC, :<br>:<br>Defendants. : | Civil Action No. 17-cv-07828<br><br>**COMPLAINT** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiffs Yippy, Inc. and Richard Granville, by and through their attorneys, John H. Snyder PLLC, in support of their Complaint against Hanover Holdings I, LLC and Magna Group LLC, state as follows on personal knowledge as to matters relating to them, and on information and belief as to all other matters.

## Parties

1. Yippy, Inc. ("Yippy") is a technology company committed to helping customers securely access data anywhere on earth. Over the past several years, Yippy has entered into a series of strategic partnerships and transactions designed to enhance Yippy's product and service offerings. The Company's foundation is built on its unlimited, perpetual, worldwide, non-exclusive license of the Velocity search platform and associated technologies which Yippy acquired in 2010 from Vivisimo, Inc. In 2012, IBM purchased Vivisimo and rebranded Velocity as IBM Watson Explorer®. Yippy maintains its worldwide perpetual license of the technology. Based upon Watson, which Yippy operates autonomously from IBM,

1

and coupled with other internally developed and acquired technologies, the Company has developed a suite of technology solutions which enhance the underlying technology's output while simplifying the deployment process. These solutions range from cloud, enterprise search, business intelligence, document security and data compression for MSS/FSS satellite and terrestrial wireless operators. Additionally, the Company has developed middleware, connectors and associated programs which enable deployments to be successful with substantially less resources and personnel as typically required in the industry. Yippy is a Nevada corporation with its principal place of business at 1845 San Marco Road, Suite 201, Marco Island, Florida 34145.

2. Richard Granville is the Founder and CEO of Yippy, with his principal place of business at 1845 San Marco Road, Suite 201, Marco Island, Florida 34145.

3. Hanover Holdings I, LLC ("Hanover") is a New York Limited Liability Company, with its principal place of business located at 40 Wall Street, New York, New York 10005.

4. Magna Group LLC is a Texas Limited Liability Company, with its principal place of business located at 40 Wall Street, New York, New York 10005.

5. Magna, Hanover, and their affiliates do business under the brand name "Magna." To avoid ambiguity, when referring to Magna's business generally, we refer to "Magna." When referring to Defendant Magna Group LLC in particular, we use its full name.

**Jurisdiction and Venue**

6. This Court has original jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1338 because this case arises under the Securities Exchange Act and the Constitution of the United States. This lawsuit is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

7. Venue in this district is appropriate because Defendants Magna Group LLC and Hanover are domiciled in the Southern District of New York and have their offices in the Southern District.

**Factual Background**

8. Magna provides "toxic finance" to small cap companies, profiting from their failure.[1] In 2012, before Magna's reputation became well-known, Yippy entered into a loan agreement, which led to litigation, which in turn led to the Settlement Agreement that forms the basis for this action. The Settlement Agreement dated is attached as **Exhibit 1**.

9. The Settlement Agreement obligated Yippy to make a series of payments, which Yippy has fully performed.

---

[1] We have attached as **Exhibit 2** a March 12, 2015 Bloomberg article by Matt Levine, which gives an excellent description of Magna's business and its use of the Section 3(a)(10) exemption from the Securities Act of 1933's registration requirements.

Attached as **Exhibit 3** is a more formal treatment of Section 3(a)(10) and its abuses, see Thomas S. Glassman, 3(A)(10) Financing: New Predatory Financing Using the Securities Act, 5 Mich. Bus. & Entrepreneurial L. Rev. 99 (2016).

10. Long before the Settlement Agreement was executed in early 2017, Magna Group LLC acquired Yippy stock certificate 640, a certificate bearing the name Magna Group LLC representing 200,000 restricted shares of common stock (the "Magna Certificate"). A copy of the Magna Certificate, as produced in discovery in 2015, is attached as **Exhibit 4**. A copy of the Magna Certificate, sent on October 10, 2017 at 5:02pm, by Scott Furst, counsel for Magna, is attached as **Exhibit 5**.

11. The Settlement Agreement gave Yippy an option to purchase the Magna Certificate for $200,000. On September 13, 2017, Yippy gave notice exercising the option. On October 5, 2017, Yippy wired the full purchase price to its attorney's escrow account, with instructions to compete the purchase. Yippy validly tendered $200,000 and demanded delivery of the Magna Certificate.

12. Magna Group LLC and Hanover failed to deliver the Magna Certificate by October 7, 2017 as prescribed by the Settlement Agreement.

13. On October 10, 2017, a telephone conversation took place, during which Scott Furst (counsel for Magna / Hanover), Mark Cortangelo (counsel for Yippy) and Richard Granville (CEO of Yippy) were present. Mr. Cortangelo is a fact witness and will not participate as counsel in this case, pursuant to the attorney-witness rule.

14. The purpose of the telephone call was to discuss why Magna / Hanover were unable to produce the Magna Certificate. During the course of the

conversation, Mr. Furst stated unequivocally that he was in physical possession of a stock certificate for 200,000 shares in the name of **Hanover Holdings I**.

15. Mr. Granville was surprised by Mr. Furst's statement because Mr. Granville knew that the Magna Certificate was the only stock certificate owned by any Magna entity. Mr. Granville responded to Mr. Furst, "are you sure it Hanover Holdings, because I thought it was Magna Group." At that point, Mr. Furst stated that he had the certificate in his possession, and reaffirmed clearly and definitively that the certificate in his possession bore the name Hanover Holdings I. Mr. Granville asked Mr. Furst to "take a picture" of the certificate. Mr. Furst stated that he would send a copy. Mr. Granville responded, in sum and substance, "no, I don't want a copy of a copy, I want a picture of the actual certificate in your possession."

16. Immediately after the telephone call, Mr. Granville consulted his stock list to confirm that no certificate bearing the name Hanover was validly issued. Thereafter, Mr. Granville contacted Yippy's transfer agent, Pacific Stock Transfer, which confirmed that the Magna Certificate remains registered under the name Magna Group LLC.

17. Thereupon, Mr. Granville sent the following email to Mr. Furst, which was sent on October 10 at 1:13pm:

> Scott,
>
> You just told Mark and myself at appropriately 11:20am this morning, to "save you the trouble from looking up the name of the certificate on the SPR, that the name on the certificate, was "HANOVER HOLIDINGS I". You said, "I have the certificate right here in my possession." Then you and I began

5

a very lengthy conversation regarding Hanover Holdings I and if they were a "valid corporation", and you affirmed "yes". I asked you if Hanover Holdings I had a bank about at Chase bank. You affirmed "yes". You read an email and contents of which are that Hanover Holding had to complete additional steps to get a Medallion stamp guarantee." You refused to share that email as proof of Chase's position. You said, "you need to get the certificate to your clients". As well as some other things I have put down on paper for history of conversation.

Here's your problem. The certificate is in the name of:

MAGNA GROUP LLC 5 HANOVER SQUARE STE 2102 NEW YORK, NY 10004

CS2-    640 200,000 Restricted 200,00009/27/12 200,000Total Restricted Shares.

I repeat the same questions as before. Is Magna Group LLC a valid corporation? Does Magna Group LLC have a valid bank account at Chase bank? If so why would they need to do any additional steps other than just walk in the door and get the VERY VERY simple transaction completed?  I recieve a Medallion from Chase in "minutes".

Please help me understand, because your argument that the contract does not state you have to provide a Stock Power "bill of sale" and a signed executed certificate both with Medallion stamps is weak. Maybe we could just surrender a check to you for $200K and not sign it.

Please take a picture of the certificate in your hand and send to us. Right now it does not appear to anyone that you actually have the certificate. You told Mark "I sent you a copy", but Mark said, "You did not send me a copy at anytime".

How do you have a certificate in your hand for Hanover Holdings I, which you repeated over and over again, when I says MAGNA GROUP, LLC.

Thank you in advance for the clarifications.

take care...
rich

18.     In the above-quoted email, Mr. Granville for a second time asks Mr. Furst to "please take a picture of the certificate in your hand and send to us." Mr. Granville could not be more explicit. He wanted proof that Mr. Furst had actual possession of a Yippy stock certificate, and if so, whose name was it under. As the CEO of a public company, Mr. Granville has an obligation to investigate potential problems with his stock, including Mr. Furst's admission that he was in possession of a forged stock certificate.

19.     Receiving no response, Mr. Granville again emailed Mr. Furst at 1:57pm, this time copying Yippy's transfer agents:

> Scott,
>
> I have just hung up with the transfer agent and we discussed the only possibility that you are in possession of a counterfeit stock certificate in the name of Hanover Holdings I. No reasonable person would think you would jeopardize your career and law license to tell us the name on a certificate and it not be correct. Especially you saying it was "right in front of you". Therefore we believe you client is lying to you, and they have created documents and counterfeited the certificate most likely in house or through their close friends who are also transfer agents (V-Stock Transfer is an example). Would you consider this a fraudulent act?
>
> Please send us a copy of the Hanover Holdings I certificate as soon as possible. As the issuer of the security and with the knowledge of this counterfeit shares exist, I need the copy and get with the proper authorities today.
>
> When do you expect to send us a picture of the certificate? We need this asap.
>
> take care…
>
> rich

20. As indicated above, once again, Mr. Granville asked, "When do you expect to send us a picture of the certificate?"

21. An hour passed. Then another. Then another. Mr. Furst remained radio silent until 5:02pm, when he casually responded:

> As an aside, a photocopy of the front of the certificate is attached. I believe I had mistakenly referred to the certificate as issued in the name of Hanover. While it's of no particular importance, I've attached the photocopy to address Mr. Granville's speculation that my client does not possess any certificate for the restricted shares.

22. Mr. Furst's response raises red flags. First, he offers absolutely no explanation for how he could have been "mistaken" as to whether a certificate that he claimed to be *actually looking at* said "Hanover Holdings I" or "Magna Group LLC," nor the several-hour delay in clarifying that point (despite urgent emails from Yippy).

23. Second, Mr. Furst once again failed to provide a picture of the certificate. He sent a photocopy of the Magna Certificate (see Exhibit 3), which proves nothing.

24. Yippy's outside counsel, Mark Cortangelo, sent a lengthy email to Mr. Furst at 8:30pm on October 11, 2017 stating in relevant part:

> On Friday, October 6, 2017, you told me that the principals were out of the country and that you didn't know where they were or when they would be back or if they could get the medallion guaranty and that your offices were uptown, not downtown near the client like they used to be, so you could not just hand the share off to them and get it stamped. But today you said that your client had the share and was trying to get it stamped. The whole sequence of events is muddled, at best. But what makes it more confounding is that today you

8

> unequivocally told us on the phone that the share certificate was in the name Hanover Holdings I, but when you sent the copy, it is to Magna. My client has serious reservations about the authenticity of the shares and further to that point demands that you furnish the stock power inadequacy note from bank along with the requested email you read to us regarding the additional steps needed. Clearly, his concerns about making sure that the documents are in order is not unfounded.

25. Mr. Furst's inconsistent statements and evasive behavior (including his continued refusal to show his purported certificate) compel Yippy to investigate and bring the matter to appropriate authorities, so that legitimate investors can be protected.

26. It should be noted that when Yippy exercised its option on September 13, 2017 to purchase the Magna Certificate for $200,000, Yippy's publicly traded stock price was approximately 65 cents per share, with downward pressure on the price that cannot be explained by business fundamentals. Magna did not expect Yippy to exercise its call option. Instead, Magna presumably expected that Yippy would be unable or unwilling to pay $1 per share for its own stock, and that Magna would be able to obtain (at deeply discounted prices) a very large block of free-trading Yippy shares through the Rule 3(a)(10) procedure set forth in the Settlement Agreement. Magna is in possession of the evidence necessary to explain this "confounding" series of events. However, it bears noting that if Yippy had not exercised its call option, Magna could have made a large profit by naked shorting ahead of the Rule 3(a)(10) procedure, then using the Rule 3(a)(10) shares to cover – either themselves or through intermediaries.

## The Settlement Agreement

27. When Hanover negotiated the Settlement Agreement with Yippy in January 2017, Mr. Furst insisted that several provisions be included, the net effect of which is to create extreme uncertainty as to Yippy's conflicting legal obligations with respect to apparent securities law violations.

28. Paragraph 8 of said Settlement Agreement states:

> Representation and Covenant Not to Sue. The Parties hereby represent and agree that, with the exception of the papers filed in the Yippy Action and the Granville Action, they have not filed or pursued, and will not file or pursue, any charges, suits, complaints, grievances, or other actions which assert, arise out of or are in any way related to the claims released under this Agreement; provided, however, that this paragraph shall not apply to any action or claim to enforce the terms of this Agreement or from responding to any inquiry about this settlement or its underlying facts by the Securities and Exchange Commission, FINRA, federal or state agency, any other self-regulatory organization.

29. Paragraph 9 of said Settlement Agreement states:

> Representation and Covenant Not to Solicit Litigation. Yippy and Granville agree and covenant that, within five (5) business days of executing this Agreement, Yippy and Granville will provide Plaintiff with a document evidencing their respective written directions to Defendants' former attorney, John H. Snyder PLLC, to remove from online posts, marketing materials, blogs, websites, website forums, bulletin boards, chatrooms, or message boards, content that does or intends to solicit clients or potential clients who have: (a) engaged in business with Plaintiff, its agents, officers, directors, employees, current attorneys, partners, members, affiliates, subsidiaries and parent companies; or (b) invested in or engaged in other business with any company that also has done business with Plaintiff, its agents, officers, directors, employees, current attorneys, partners, members, affiliates, subsidiaries and parent companies, and Yippy and Granville shall obtain Mr. Snyder's written confirmation of his compliance with such directions

10

within ten (10) business days of executing this Agreement and provide same to Plaintiffs Counsel.

30. Paragraph 10 of the Settlement Agreement provides:

> Non-disparagement. Each Party agrees and covenants that Each Party will not, at any time, disparage or make negative or false statements about any other Party or any subsidiary or affiliated entity of any Party and any officer, shareholder, director, employee, agent, or attorney of any Party in their individual or representative capacities. Each Party shall report, in accordance with the notice provisions set forth under the Agreement, to each other Party any actions or statements that are attributed to a Party that the reporting Party believes are disparaging or false. The reporting Party may take actions consistent with the provision for breach of this Agreement, except as they relate to Paragraphs 1 or 3, should it determine that a Party has disparaged or made false statements about the reporting Party. The foregoing shall not prohibit or limit a Party's ability to respond truthfully to any inquiries from or satisfy any disclosure requirements to any governmental or regulatory authorities.

31. During the negotiation of the Settlement Agreement, on January 9, 2017, Mr. Furst explained the purpose of these provisions:

> Yippy and Granville shall jointly execute an affidavit, approved by Hanover's Counsel, that shall be provided to the United States Securities and Exchange Commission ("SEC") retracting any all allegations made by Yippy, Inc. and Granville relating to Hanover, Magna, affiliated companies, and any of their officers and employees, relating to their business, trading practices, or enforcement of their contractual rights as to any individual or entity with which they do business, and further aver that they have identified no evidence to substantiate the allegations made by them or on their behalf in connection with this Yippy action or the Granville defamation action, to any investors in the marketplace under their own names or using anonymous aliases, or to the SEC concerning any of the subjects raised by Yippy or Granville in connection with any pleadings, discovery, or motions arising from this Yippy action or the Granville defamation action. **[Mr. Granville has asked me to me to direct 2 sets of inquiries to certain employees relating to**

11

**transfer agent change and a press release issuance for Tag Like Me and to report back to him. That report/response may then confirm a good faith basis for Mr. Granville to execute an affidavit that neither Yippy nor Mr. Granville have identified any evidence to substantiate the allegations made by them or on their behalf concerning shorting, "naked" shorting or violations of the securities laws. Additional subject matter of the affidavit t/b/d. Mr. Granville understands that any settlement agreement would not preclude him from complying with a subpoena issued by any governmental body.]**

32. Separately and together, these provisions create legitimate question as to Yippy's obligations.  The terms of the Settlement Agreement are reasonably interpreted to prohibit Yippy from bringing evidence of securities law violations committed by Magna to the SEC.  Paragraph 8 forbids Yippy from filing "any . . . complaints, grievances, or other actions which assert, arise out of or are in any way related to the claims released under this Agreement" (as is the case here). Paragraph 9 prohibits solicitation of litigation, which could encompass discussions with the SEC's Enforcement Division or the United States Attorney's Office. Paragraph 10 prohibits Yippy from making "negative or false statements" about Magna, with the disjunctive indicating that Yippy is barred from making truthful statements that may be unflattering to Magna.

# FIRST CAUSE OF ACTION
**Declaratory Judgment Pursuant to 15 U.S.C. § 78cc**

33. The foregoing allegations are incorporated by reference.

34. Yippy is a publicly traded company, and Mr. Granville is the Chairman and CEO of Yippy.

35. Mr. Granville has concluded that his fiduciary responsibilities require him to act proactively to protect his legitimate investors.

36. Pursuant to 15 U.S.C. § 78cc:

(a) Waiver provisions

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void.

(b) Contract provisions in violation of chapter

Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and **every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation**: Provided, (A) That no contract shall be void by reason of this subsection because of any violation of any rule or regulation prescribed pursuant to paragraph (3) of subsection (c) of section 78o of this title, and (B) that no contract shall be deemed to be void by reason of this subsection in any action

13

maintained in reliance upon this subsection, by any person to or for whom any broker or dealer sells, or from or for whom any broker or dealer purchases, a security in violation of any rule or regulation prescribed pursuant to paragraph (1) or (2) of subsection (c) of section 78o of this title, unless such action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after such violation. The Commission may, in a rule or regulation prescribed pursuant to such paragraph (2) of such section 78o(c) of this title, designate such rule or regulation, or portion thereof, as a rule or regulation, or portion thereof, a contract in violation of which shall not be void by reason of this subsection.

37. In the absence of any plausible explanation from Mr. Furst or Magna regarding why the Magna Certificate has not been produced (and why Mr. Furst told us that he had possession of a certificate in the name of Hanover Holdings I), Yippy and Mr. Granville have a well-supported concern that its stock may have been manipulated by Magna.

38. Insofar as the Settlement Agreement is construed to limit the right of Yippy and Mr. Granville to discuss these matters with shareholders and appropriate authorities, it is unenforceable.

## SECOND CAUSE OF ACTION
### Declaratory Judgment Pursuant to the First Amendment to the United States Constitution

39. The foregoing allegations are incorporated by reference.

40. Under the First Amendment to the United States, judicial enforcement of the Settlement Agreements in a fashion that limits Yippy's right to comply with other governmentally imposed duties constitutes state action.

41. Without declaratory relief, Yippy and Mr. Granville are forced to choose between violating state-imposed fiduciary duties to shareholders and the

14

Company (on the one hand) and potentially violating the restrictive covenants that Magna and Mr. Furst insisted upon in January 2017.

42. The Settlement Agreement violates the First Amendment right to free speech.

### THIRD CAUSE OF ACTION
**Declaratory Judgment – Public Policy**

43. The foregoing allegations are incorporated by reference.

44. As a matter of public policy, Courts will not enforce agreements that purport to bar a party from reporting unlawful conduct.

### FOURTH CAUSE OF ACTION
**Specific Performance**

45. The foregoing allegations are incorporated by reference.

46. Yippy has made all payments due under the Settlement Agreement.

47. Yippy stood ready, willing and able to purchase the Magna Certificate for $200,000. Magna has failed to tender the Magna Certificate, and has failed to provide proof that Magna remains in possession of the Magna Certificate.

48. Yippy's obligations under the Settlement Agreement have been fulfilled. Magna should be ordered to take all steps necessary to remove the five (5) UCC-1 filings, which to date, Magna has not removed.

## **Prayer for Relief**

WHEREFORE, Plaintiffs request that the Court enter judgment:

A) Declaring the Settlement Agreement void, to the extent it purports to limit Yippy's ability to report securities violations to investors and/or regulators.

B) Declaring that Plaintiffs may report truthfully to the SEC and investors regarding evidence of securities law violations affecting Yippy stock.

C) Ordering Magna to remove all UCC-1 filings made pursuant to the Settlement Agreement.

Dated:    New York, New York
          October 11, 2017

_____
JOHN H. SNYDER

John H. Snyder
555 Fifth Avenue, Suite 1700
New York, New York 10017
Tel: (212) 856-7280
Fax: (646) 304-9230
*john@jhsnyderlaw.com*

*Counsel to Richard Granville and Yippy, Inc.*